## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 0:23-cv-60057-WPD

JOSHUA BERDUGO, individually and on
behalf of all others similarly situated,

     Plaintiff,

v.

                            **JURY TRIAL DEMANDED**

GEMINI TRUST COMPANY, LLC; TYLER
WINKLEVOSS; and CAMERON
WINKLEVOSS,

     Defendants.

_____/

### AMENDED CLASS ACTION COMPLAINT

Plaintiff Joshua Berdugo ("Plaintiff"), individually and on behalf of all other persons similarly situated as defined herein, by and through undersigned counsel, brings this class action against Defendants Gemini Trust Company, LLC ("Gemini"), Tyler Winklevoss and Cameron Winklevoss (collectively, the "Winklevosses" and collectively with Gemini, "Defendants"), and alleges, based upon personal knowledge as to himself and his own acts and experiences, and on information and belief as to all other matters based upon, *inter alia*, the investigation of counsel, as follows:

### NATURE OF THE ACTION

1.      This is a class action on behalf of a class of investors consisting of all individuals and entities who, during the Class Period (defined below), transferred cryptocurrency assets to Gemini in exchange for interest payments, *i.e.*, bought Gemini interest accounts ("GIAs"), via the Gemini Earn Program ("Gemini Earn"), and who suffered financial injury as a result thereof. Gemini unlawfully failed to register GIAs as securities before selling to individual investors.

Moreover, Gemini made repeated false and misleading statements to promote Gemini Earn, including that GIAs were a secure method of collecting interest.  In addition, Gemini omitted and concealed material information concerning the risks associated with Gemini Earn.  In particular, Gemini concealed information concerning its borrower in connection with the program, Genesis Global Capital, LLC ("Genesis").

2.       To participate in Gemini Earn, investors were required to purchase GIAs with bitcoin ("BTC")[1] or fiat currency.  Plaintiff and other Gemini Earn investors were led to believe, and expected, that the GIAs they purchased would be worth more than the BTC or fiat currency they invested into Gemini Earn.

3.       Gemini loaned its investors' cryptocurrency assets to Genesis; and when Genesis encountered financial distress as a result of collapses in the cryptocurrency market in 2022, including that of FTX Trading Ltd. ("FTX"), Genesis was unable to return the cryptocurrency assets it had borrowed from Gemini Earn investors.

4.       On or about November 16, 2022, Gemini halted the Gemini Earn program and refused to honor any further investor redemptions -- wiping out investors' holdings, including Plaintiff's.

5.       The final straw exposing that Gemini Earn is no more than another fraud in the cryptocurrency space was a letter dated January 10, 2023 by Barry Silbert of Genesis's parent

---

[1] Bitcoin is a type of "virtual currency" – also commonly referred to as "digital currency" or "cryptocurrency."  The Financial Action Task Force -- an inter-governmental agency that promotes laws combating anti-money laundering, and in which the United States is a member -- describes "virtual currency" as a "digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction."  Importantly, virtual currencies do not have legal tender status like fiat currencies (*e.g.*, U.S. Dollar and the Euro).  The most widely used virtual currencies are BTC and ethereum ("ETH").

company Digital Currency Group ("DCG").  That letter confirmed concerns that Gemini Earn investors' money was being used to subsidize highly risky investments made by Genesis: an unregulated, unaccountable entity, in a way strikingly reminiscent of the fraud at the hands of cryptocurrency exchange FTX and Sam Bankman-Fried's trading firm Alameda Research.

6.      Emphasizing the significance of the revelations in the Barry Silbert letter, and clarifying that Gemini will not be refunding its customers' losses -- which it has blamed on a fraud purportedly carried out by Genesis and DCG -- Cameron Winklevoss published a January 10, 2023 open letter on Twitter addressed to the DCG Board:

**An Open Letter to the Board of Digital Currency Group**

I am writing to let you know that Gemini and more than 340,000 Earn users have been defrauded by Genesis Global Capital, LLC (Genesis), together with its parent company Digital Currency Group, Inc. (DCG), its founder and CEO Barry Silbert, and other key personnel. These parties conspired to make false statements and misrepresentations to Gemini, Earn users, other lenders, and the public at large about the solvency and financial health of Genesis. They did so in an effort to mislead lenders into believing that DCG had absorbed massive losses that Genesis incurred from the Three Arrows Capital Ltd. (3AC) collapse and induce lenders to continue making loans to Genesis. By lying, they hoped to buy time to dig themselves out of the hole they created.

7.      Cameron Winklevoss continues:

Beginning in early July 2022, Barry, DCG, and Genesis embarked on a carefully crafted campaign of lies to make Gemini, Earn users, and other lenders believe that DCG had injected $1.2 billion of actual support into Genesis.

**Public lies.** On July 6th, Michael Moro, then-CEO of Genesis, tweeted:

> "DCG has assumed certain liabilities of Genesis related to [3AC] to ensure we have the capital to operate and scale our business for the long-term."

This statement was false and misleading. In reality, DCG had *not* ensured that Genesis had the capital to operate. In fact, DCG hadn't given Genesis so much as a penny of actual funding to make up for the 3AC losses. Instead, DCG entered into a 10-year promissory note with Genesis at an interest rate of 1% — due in *2032*. This note was a complete gimmick that did nothing to improve Genesis's immediate liquidity position or make its balance sheet solvent (more on this later). And even though DCG was tagged in Moro's tweet, no one from DCG, including Barry, bothered to correct his misstatement.

8.    In reality, Gemini and the Winklevosses were instrumental in defrauding hundreds of thousands of investors by capitalizing on the general public's excitement for virtual currencies and skepticism about their stability and by luring unsuspecting investors into purchasing unregistered securities.

9.    For offering and selling unregistered securities, including GIAs and other cryptocurrency assets on Gemini, without registering as a national securities exchange or as a broker-dealer and without filing any registration statements for such securities, this action alleges violation of Sections 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act").

10.    In addition, for promoting and touting GIAs as a safe and secure method for storing cryptocurrency assets from February 2, 2021 through the present (the "Class Period"), this action alleges Gemini made actionable misrepresentations and/or omissions under Section 10(b) of the Exchange Act.

11.    Plaintiff and the proposed Class are not alone in their allegations; as on the same date this action was filed, the U.S. Securities and Exchange Commission ("SEC") filed a civil case against Gemini and Genesis asserting they each engaged in "the unregistered offer and sale of securities to retail investors through the Gemini Earn crypto asset lending program."[2]

12.    The Winklevosses, by virtue of their control of Gemini during the Class Period, had the power and authority to direct the management and activities of Gemini and its employees and to cause Gemini to engage in the wrongful conduct detailed herein.

13.    Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws,

---

[2] https://www.sec.gov/news/press-release/2023-7 (last visited Jan. 12, 2023).

Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security.

14.     As detailed herein, Gemini Earn has at all times constituted an offer and sale of unregistered securities.

15.     In addition, Defendants made numerous misleading statements featuring material omissions about the reality of Gemini Earn.

16.     For these reasons, Plaintiff on behalf of himself and all similarly situated individuals and entities that invested in GIAs or Gemini Earn during the Class Period, seeks compensatory, exemplary, punitive, injunctive, and rescissory relief, providing rescission and repayment of all investments into GIAs and/or Gemini Earn and securing and conserving such funds until repayment.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 because they arise under the laws of the United States.

18.     The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein

occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## PARTIES

20.     **Plaintiff Joshua Berdugo** is an individual domiciled in Hollywood, Florida and is *sui juris*.  Beginning on or about September 5, 2022, Plaintiff funded his Gemini Earn account, through Gemini's website, by investing approximately $13,000.00.  He believes the assets he has lost to be valued at $13,363.23 Gemini dollars ("GUSD").

21.     **Defendant Gemini** is a New York-organized limited liability company duly registered with and doing business in the State of New York, with its principal place of business in New York, New York.

22.     Upon information and belief, **Defendant Tyler Winklevoss** is a citizen and resident of New York, New York or Palm Beach, Florida.  Tyler Winklevoss is the co-founder and CEO of Gemini.  He owns a substantial equity stake in Gemini.

23.     Upon information and belief, **Defendant Cameron Winklevoss** is a citizen and resident of New York, New York or Palm Beach, Florida.  Cameron Winklevoss is the co-founder and President of Gemini.  He owns a substantial equity stake in Gemini.

## FACTUAL ALLEGATIONS

### Gemini's Launch

24.     The Winklevosses announced the launch of Gemini in 2013 and publicly released the platform in 2015.  Gemini currently offers a variety of products, including the cryptocurrency exchange Gemini Exchange and the Gemini Credit Card.  Gemini Earn, which launched in 2021,

is the lending platform that allows users to loan their cryptocurrency assets in exchange for interest payments and sells the unregistered security at issue in this Complaint.

25.     Since they founded Gemini, the Winklevosses have been intimately involved in overseeing, managing and promoting the platform.   They control Gemini and have decision-making authority as to the company's actions.

26.     In a Reddit post from 2018, Cameron Winklevoss stated:

> We are Cameron and Tyler Winklevoss, co-founders of Gemini—a cryptocurrency exchange and custodian—identical twins, Olympians, and angel investors. A lot has changed since our last AMA in 2015 and we look forward to discussing what we think the cryptocurrency revolution needs to succeed. AMA, or AUA![3]

27.     With the demise of a number of competitors in 2022, including FTX, Gemini is now one of the most dominant cryptocurrency asset companies in the United States and portrays itself as possessing a superior emphasis on security and risk management than other companies that offer similar products in the cryptocurrency space.   Gemini has expanded globally and now operates in more than 65 countries.

28.     Over 150 digital assets, "stablecoins," and tokens are traded on the Gemini Exchange.   The vast majority of these tokens are unregistered securities.   In violation of federal law, Gemini Exchange was required but failed to register with the SEC as an exchange.

29.     Instead, in a large-scaled ad campaign, Gemini misleadingly touted itself as "the Regulated Cryptocurrency Exchange":

---

[3]   https://www.reddit.com/r/IAmA/comments/adk0ua/we_are_cameron_and_tyler_winklevoss_cofounders_of/ (last visited Jan. 11, 2023).



30.     In a blog post on Gemini's website dated January 7, 2019, Tyler Winklevoss promoted a "full-page ad in the *New York Times* outlining what we think the cryptocurrency revolution needs to succeed," falsely highlighting that Gemini would "work with regulators to establish thoughtful regulation that promotes positive and fair outcomes for all."[4]

---

4     https://www.gemini.com/blog/geminis-principles-for-the-cryptocurrency-revolution     (last visited Jan. 11, 2023).

**1. Build the Rules**.

*To work with regulators to establish thoughtful regulation that promotes positive and fair outcomes for all.*

**2. Play by the Rules.**

*To operate with necessary governmental or regulatory approvals. Ask for permission, not for forgiveness.*

**3. Value Security Over Profit.**

*To never cut corners. To set the standard and follow best practices in order to provide a platform that is free of hacking and fraud.*

**4. Be Principled.**

*To do the right thing—because it's the right thing—even when it's the hard thing. To put the interests of our customers ahead of our own and provide proper disclosures and transparency.*

**5. Pay it Forward.**

*To bring cryptocurrency to the people and places that need it most.*

**Gemini Earn's Launch**

31.     On February 2, 2021, Gemini launched Gemini Earn.  A Gemini blog post announced Gemini Earn as "the only cryptocurrency interest-earning product available in all 50 states," with yields of up to 7.4% annual percentage yield ("APY") (later revised to "up to 8.05% APY") and flexible redemption policies.

32.     Investors, as the "Lenders" in Gemini Earn, entered into tri-party Master Loan Agreements ("MLAs") with Gemini as the "Custodian" and Genesis as the "Borrower."  The MLA states that "Gemini serves as custodian of Digital Assets for Lender, and Lender have appointed Gemini as its agent to facilitate Loans of its Digital Assets."  Genesis would sent interest payments

to Gemini, which would then deduct an "Agent Fee" before distributing the remainder of the interest payments to Gemini Earn investors.

33.     Pursuant to the MLAs, the "Loans will be Open Term Loans unless otherwise specified," whereby investors, including Plaintiff, would have the ability to lend their cryptocurrency assets for as long as they desired, with the "option to demand immediate payment of a portion or the entirety of the Loan Balance at any time."

34.     Gemini promised Gemini Earn investors, including Plaintiff, a yield or "APY" on their GIAs.  Gemini typically paid out the yield to investors daily; and with each such payout, Gemini collected fees.  However, Genesis earned revenue by lending the cryptocurrency assets at a higher rate than it paid to Gemini Earn and other investors.

35.     By the end of August 2021, $3 billion in loans had been originated by Gemini Earn investors through GIAs.  Gemini's blog post celebrating that milestone also reiterated Gemini's core promises to investors with statements like: "[I]nterest is Earned and compounded daily, and you can redeem your cryptocurrency at any time."

36.     The Gemini Earn page as it appeared at launch in February 2021 was ambiguous as to where investors' loaned funds would be held.  The only mention of Genesis is in a lower section, where it is framed as if it is only one of several partners called "vetted and accredited third party institutional-grade borrowers including Genesis Capital."  In reality, Gemini Earn had only one lending partner at all times: Genesis.

## How Earn Works

Gemini Earn pays a higher interest rate than most existing options to earn interest on cryptocurrency.



On the Gemini platform, customers can view their combined trading balance and Earn balance, as well as the interest they've earned



Gemini is partnering with vetted and accredited third party institutional-grade borrowers including Genesis Capital



Gemini notifies customers when interest payments hit their accounts, and users can check balances in real time

37.   In a February 2021 press release launching Gemini Earn, Tyler Winklevoss stated, "We designed a program that allows our customers the ability to generate a real return on their crypto holdings."

38.   Shortly thereafter, more detail was added to the landing page, but it did not elaborate on the specifics on the "borrowers," nor did it make it clear that Genesis was the sole borrower of all investor assets deposited on Gemini Earn.

39.   Gemini's website also claimed that Gemini Earn investors could "receive more than 100x the average national interest rate, among the highest rates on the market" and that Gemini Earn "offer[s] more flexibility than other yield-generating cryptocurrency investments."   The website also featured a calculator that would allow a user to select a deposit amount, crypto asset type, and a time frame to see how much interest could be earned by tendering cryptocurrency assets through Gemini Earn.

40.   Gemini published tweets promoting the high interest rates offered via Gemini Earn, such as the following on May 26, 2021:



You can now earn up to 7.4% APY on your Gemini dollars $GUSD with #GeminiEarn! That's more than 100 times the national U.S. average. GUSD is a 1:1 USD-backed stablecoin that can always be bought and sold for exactly $1 at Gemini.

41.     By 2022, Gemini knew, or should have known, that its sole lending partner Genesis was in financial distress and failed to report such information to investors in Gemini Earn to allow them to protect their financial positions.

42.     In July 2022, it was reported that Genesis had "hundreds of millions" in losses as a result of its exposure to Singapore-based cryptocurrency hedge fund Three Arrows Capital ("3AC"), which by that time had filed for bankruptcy.[5]

43.     Gemini did not disclose to investors in Gemini Earn that Genesis could not honor redemptions by investors in Gemini Earn because Genesis was insolvent.  Instead, Defendants continued to promote the program to new investors and allowed existing investors to loan additional cryptocurrency in their accounts.

44.      If a visitor to Gemini's website clicked "Learn More" on the section of the page discussing whether Gemini Earn funds were insured, they would be brought to a support page that discussed ways that Gemini purported to minimize risk, but the Gemini website did not disclose what those risks might be and certainly never suggested that investors might risk a total loss of access to their cryptocurrency invested.

---

[5]  https://www.coindesk.com/business/2022/06/29/genesis-faces-hundreds-of-millions-in-losses-as-3ac-exposure-swamps-cryptocurrency-lenders-sources/ (last visited Jan. 11, 2023).

45.     The Winklevosses directly managed and oversaw Gemini Earn and approved all marketing of the program.  Indeed, both Tyler and Cameron Winklevoss heavily promoted Gemini Earn without disclosing any risks:





**Gemini's Relationship with Genesis**

46.     Genesis was founded in 2013 and is owned by DCG.  In March 2018, Genesis began obtaining cryptocurrency assets from large institutional and other accredited investors in exchange for a promise to pay interest on those investors' cryptocurrency assets.  It earned a profit by lending the crypto assets to Institutional Borrowers at a higher rate than it paid to its investors.  Genesis pooled the investors' cryptocurrency asset and exercised discretion over how to deploy the assets to earn income.  In the first quarter of 2022, Genesis disbursed more than $44.3 billion in loans.

47.     In December 2020, Genesis entered into an agreement with Gemini to offer Gemini customers, including U.S. retail investors, an opportunity to tender their cryptocurrency assets to Genesis in exchange for Genesis's promise to pay interest.

48.     Gemini's leading, and what turned out to be sole, partnership with Genesis allowed Gemini to collect part of the spread between interest paid on the cryptocurrency and interest Genesis charged on its loans.  Also, Gemini provided retail investors with access to Genesis, which otherwise only engaged in cryptocurrency asset transactions with large institutional and other accredited investors.

49.     The Gemini-Genesis partnership was touted as being based on trust, compliance, and responsible custodianship.  Gemini referred to Genesis as a "trusted lending partner," and multiple publications repeated Gemini's claim that Genesis's loans were overcollateralized.

50.     According to an article on *CoinDesk*, "[a]s part of the partnership, Gemini reviewed Genesis's financial statements and verified that the lender's loans are overcollateralized, Gemini Head of Risk Yusuf Hussain said."  The *CoinDesk* article does not disclose that *CoinDesk* is also owned by DCG.

51.     Genesis loaned an additional $575 million worth of crypto assets, including those of Gemini Earn investors, to Genesis's parent company DCG, which DCG used to fund investment opportunities and repurchase DCG stock from non-employee shareholders in secondary transactions.

52.     In 2021 and 2022, multiple high-profile bankruptcies, legal battles, security breaches, and fraud allegations reverberated across the cryptocurrency industry.  It has been reported that more than $2 trillion in cryptocurrency assets have been erased since the peak of the cryptocurrency boom in 2021.  Two of the most notorious and far-reaching recent collapses have been those of Terraform Labs in May 2022 and FTX in November 2022.

53.     As a result of the Terraform Labs collapse, on or about July 1, 2022, 3AC filed for bankruptcy.  To maintain solvency, DCG, led by founder Barry Silbert, assumed $1.1 billion of 3AC's outstanding debt to Genesis.  Genesis liquidated its position in 3AC.

54.     Directly following Terraform Labs's collapse and the ensuing events, Gemini undertook a significant reshuffling of staff and layoffs within its risk and management teams.

55.     In November 2022, after FTX's implosion was publicly revealed, Genesis at first claimed it had no exposure to FTX's collapse.  However, on November 9, 2022, Genesis admitted through a tweet it had "hedged and sold collateral resulting in a total loss of approximately $7 million across all counterparties, including Alameda (FTX's affiliate trading firm)."  Then, on November 10, 2022, Genesis changed its story again, revealing that its derivatives business had over $175 million frozen on FTX.  As a result, DCG opted to strengthen Genesis' balance sheet with an equity infusion of $140 million.

56.     On November 16, 2022, the same day FTX filed for bankruptcy, Genesis announced that its loan unit was halting redemptions and new loan origination, which would paralyze Gemini Earn.

57.     Also on that same day, immediately following Genesis's announcement, Gemini abruptly suspended customer withdrawals from Gemini Earn and announced it would be pausing withdrawals on its GIAs as a result of being unable to redeem funds entrusted to Genesis.

58.     On November 23, 2022, Genesis founder and DCG CEO Barry Silbert broke his silence to address investors in a letter that contained some shocking revelations about the state of Genesis and DCG -- including that in addition to the $1.1 billion in 3AC liabilities that DCG had assumed, DCG also then owed Genesis approximately $575 million, which is due in May 2023.

59.     No further word came from Genesis, DCG, or Barry Silbert on Genesis's dire financial straits until finally, on January 10, 2023, a Q&A attached to a letter to investors from Barry Silbert addressed DCG's decision to take on the bankruptcy claim against 3AC and represented that DCG "did not receive any cash, cryptocurrency, or other forms of payment" for a $1.1 billion promissory note from Genesis.  "DCG effectively assumed Genesis's risk of loss on the [3AC] loan with no obligation to do so."[6]

60.     Following that letter, Gemini sent out emails to Gemini Earn customers, notifying them that the program was officially terminated:

> "We are writing to let you know that Gemini, acting as agent on your behalf, has terminated the Master Loan Agreement (MLA) between you and Genesis Global Capital, LLC (Genesis), effective as of January 8, 2023 . . . This officially terminates the Earn program and requires Genesis to return all assets outstanding in the program . . . Existing redemption requests are not impacted and continue to await fulfillment by Genesis."

---

[6] https://dcgupdate.com/ (last visited Jan. 11, 2023).

61.     Current estimates put Genesis's debt to Gemini Earn investors at around $900 million, from about 340,000 Gemini Earn investors, most residing in the United States.  According to published reports, Genesis has $2.8 billion in outstanding loans on its balance sheet, of which 30% are made to related parties and to DCG.

62.     On January 12, 2023, the SEC filed a complaint against Gemini and Genesis in the Southern District of New York for their unregistered offer and sale of securities through Gemini Earn, claiming violations of Sections 5(a) and 5(c) of the Securities Act.[7]

## THE GIAs ARE SECURITIES

63.     Under the Securities Act, a "security" is defined as including any "note," "investment contract," or "instrument commonly known as a 'security.'" *See* 15 U.S.C. §§ 77b(a)(1) *et seq*.  Here, the MLAs in Gemini Earn each constitute an investment contract.  In *SEC v. W.J. Howey Co.*, the United States Supreme Court established a three-part test to determine whether an offering, contract, transaction, or scheme constitutes an investment contract.[8]  Under the test articulated in *Howey*, a contract, transaction, or scheme is an "investment contract" if it involves: (i) the investment of money; (ii) in a common enterprise; (iii) with the expectation of profits to come solely from the efforts of others.

64.     Gemini promoted GIAs to the general public as investments with statements such as "invest better with Gemini Earn," "[p]ut your cryptocurrency to work" and "Earn cryptocurrency."

---

[7] https://www.sec.gov/litigation/complaints/2023/comp-pr2023-7.pdf (last visited Jan. 12, 2023).

[8] *See SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946); *see also Intern. Bhd. of Teamsters v. Daniel*, 421 U.S. 837, 852 (1979) (noting that the *Howey* test is not the only test for determining a security, but has been held to embody "all the attributes that run through all of the Court's decisions defining a security").

65.     Gemini sold GIAs to investors in exchange for the investment of money (through the purchase of cryptocurrency assets).

66.     Gemini transferred the GIA investors' cryptocurrency assets to Genesis, which would then pool those assets and invest them in a manner that was expected to generate returns for both Gemini and GIA investors.

67.     Investors in the GIAs had an expectation of profit.  In exchange for the borrowed cryptocurrency assets, Gemini promised to pay GIA investors interest.  The interest rates varied "based on the supply and demand for each cryptocurrency in cryptocurrency lending markets."

68.     Through its statements and actions, Gemini created an expectation that Gemini Earn investors would receive such profits based on the efforts of Gemini and its "partners" or "borrowers," which would control and manage the loaned cryptocurrency assets.

## DEFENDANTS' ACTIONABLE MISREPRESENTATIONS AND OMISSIONS

69.     Beginning in or around April 2021, Defendants made the following misrepresentations on Gemini's website:

- **"Redeem your assets at any time. No hidden fees.**

  Withdraw your assets instantly."

- "Loans you make through Gemini Earn may be called back by you at any time."

- "Typically, Gemini can process your redemption quickly after you request your funds . . . [I]n all cases our partners are required to return your funds to you within five business days."

70.     Those statements were false and misleading when Defendants made them. Defendants failed to disclose to investors that: (i) under certain circumstances, such as in the event of financial distress of the so-called "partner" (*i.e.*, Genesis), the funds would not be returned; (ii)

so-called "partners" were not keeping customer funds segregated and instead were intermingling such funds with other funds; and (iii) the funds were being placed in the hands of risky ventures including Terraform Labs and FTX, with the investments being undercollateralized.

71.     In addition, Defendants made this misrepresentation on Gemini's website:

> Gemini partners with accredited third-party borrowers like Genesis, who are vetted through a risk management framework that reviews our partners' collateralization management process. Additionally, on a periodic basis we conduct analyse [sic] of our partners' cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and healthy financial condition of our partners.

72.     That statement was false and misleading when made because, *inter alia*: (i) Gemini partnered with only one third-party borrower, Genesis, thus substantially increasing the risk of loss for investors due to a lack of diversification of its loan portfolio; (ii) "accredited" is a meaningless term in this circumstance; and (iii) Defendants failed to "vet" or thoroughly review Genesis and its financial stability on the periodic basis represented.

73.     The Winklevosses have also engaged in a pattern of misleading and deceptive statements about Gemini Earn.   To give just one example, on November 9, 2022, Cameron Winklevoss tweeted the following:



Tyler Winklevoss retweeted these statements.  The second, third, and fourth tweets in the above chain were entirely misleading and/or false because the Winklevosses failed to disclose that Gemini's so-called trading partner, Genesis, was deeply exposed to FTX; customer funds were not held for withdrawal at any time, but were used by Genesis for trading; and the trading required no specific authorization by the customer.

74.    DCG's January 10, 2023 letter exposed after-the-fact that it was Genesis's parent company DCG that "effectively assumed Genesis's risk of loss"; and that Gemini Earn investors' money was being used to subsidize highly risky investments made by an unregulated, unaccountable entity (Genesis) in a situation strikingly reminiscent of that of FTX and Sam Bankman-Fried's trading firm Alameda Research.

## CLASS ALLEGATIONS

75.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> All persons or entities in the United States within the applicable statute of limitations period who invested in Gemini Earn or purchased GIAs and were harmed thereby.

76.     Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

77.     **Numerosity:**  The class members are so numerous that individual joinder of all class members is impracticable.  Upon information and belief, the Class exceeds 100,000 persons. The precise number of class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the records of Defendants.

78.     **Commonality:**  There are numerous questions of law and fact common to the Class, including but not limited to:

a.     Whether Defendants made material misrepresentations and/or omissions concerning the GIAs and Gemini Earn accounts;

b.     Whether Gemini was required to have been registered as a national securities exchange;

c.     Whether Gemini operated as an unregistered broker-dealer;

d.     Whether Gemini promoted, solicited, offered, or sold unregistered securities to the Class;

e.      Whether the Winklevosses were liable as "control persons" for Gemini's conduct; and

f.      Whether members of the Class suffered damages because of Gemini's conduct.

79.      **Typicality:**  Plaintiff's claims are typical of the claims of the class members, as they are all based on the same factual and legal theories.

80.      **Adequacy of Representation:**  Plaintiff is a representative who will fully and adequately assert and protect the interests of the class and has retained competent counsel.

81.      **Declaratory and Injunctive Relief.**  Rule 23(b)(2) of the Federal Rules of Civil Procedure:  Defendants have acted or refused to act on grounds generally applicable to Plaintiff and Class members, thereby making appropriate declaratory relief and injunctive relief, with respect to the Class as a whole.

82.      Plaintiff seeks a declaration that Defendants were required to register GIAs as securities by filing a registration statement with the SEC.

83.      Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendants from engaging in the acts described above, such as selling unregistered securities.

84.      Unless a class is certified, Defendants will retain monies received as a result of their conduct that were taken from Plaintiff and the Class members.  Unless a class-wide injunction is issued, Defendants will continue to commit the violations alleged and the members of the Class will continue to be unlawfully eavesdropped upon.

85.      **Superiority:**  In this lawsuit, a class action is superior to all other available methods for its fair and efficient adjudication; because individual litigation of the claims of all class

members is economically infeasible and procedurally impracticable.  This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

86.    **Predominance:**  Common questions of law and fact predominate over any questions affecting only individual Class members.  Similar or identical violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

## CAUSES OF ACTION

### COUNT I
### Unregistered Offer and Sale of Securities—Violation of Securities Act §§ 5 & 12(a)(1)
### (Against Gemini)

87.    Plaintiff re-alleges, and adopt by reference herein, paragraphs 1 through 86 above as if fully stated herein.

88.    Section 5(a) of the Securities Act provides that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly: (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale. 15 U.S.C. § 77e(a).

89.    Section 5(c) of the Securities Act provides that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or

communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while  the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."  15 U.S.C. § 77e(c).

90.     When issued through the Gemini Earn program, the GIAs were securities within the meaning of Section 2(a)(1) of the Securities Act.

91.     During the Class Period, Gemini sold, promoted, and/or solicited GIAs directly to Plaintiff and the Class members.  Gemini therefore directly or indirectly made use of means or instruments of transportation or communication in interstate commerce to offer to sell or to sell securities or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.  Gemini used interstate commerce to offer and sell securities through Gemini Earn by, among other things, engaging in general solicitation through their websites and other promotional materials, including social media.

92.     No registration statements have been filed with the SEC or have been in effect with respect to any of the GIAs.

93.     Gemini's public disclosures contained selective or no information about Genesis' operations, financial condition, liquidity, or other factors relevant in considering whether to invest in Gemini Earn.  Investors lacked full and detailed information about how Genesis deployed their cryptocurrency assets, including its exposure to volatility in cryptocurrency asset markets, the financial condition of Genesis's counterparties and the amount of collateral it obtained, if any, as part of its loans to Institutional Borrowers.

94.     Section 12(a)(1) grants Plaintiffs a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

95.     Accordingly, Gemini violated Section 5 of the Securities Act and is liable to Plaintiff and the Class under Section 12(a)(1) for damages, disgorgement of ill-gotten gains, and/or recission.

## COUNT II
## <u>Violation of Section 10b-5 of the Exchange Act</u>
## (Against Gemini)

96.     Plaintiff re-alleges, and adopt by reference herein, paragraphs 1 through 86 above as if fully stated herein.

97.     The GIAs are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1); and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

98.     Section 10(b) and Rule 10b-5(b), 17 C.F.R. § 240.0b-5(b), make it illegal, in connection with the purchase or sale of a security, "for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

99.     Gemini carried out a plan, scheme, and course of conduct to deceive investors that GIAs were a safe method of collecting interest payments through the Gemini Earn program.  That

caused investors to consider money invested in GIAs to be equivalent to its value in fiat currency or other cryptocurrency, causing investors to purchase GIAs at artificially inflated prices.

100.    In connection with their sale of GIAs through the Gemini Earn program, Gemini disseminated, approved, and/or endorsed the false statement described herein, which Gemini knew, or recklessly should have known, were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements, given the circumstances under which they were made, not materially misleading.

101.    Gemini employed devices, schemes, and artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading, and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially inflated market prices for GIAs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102.    As a direct and proximate result of Plaintiff's and the Class Members' reliance on the statements made to them by Gemini, Plaintiff and the Class Members have suffered damage.

103.    As a result of Gemini's conduct, it is liable to Plaintiff and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

## COUNT III
## Control Person Liability: Violation of Section 15 of the Securities Act
### (Against Tyler Winklevoss and Cameron Winklevoss)

104.    Plaintiff re-alleges, and adopt by reference herein, paragraphs 1 through 86 above as if fully stated herein.

105.    The Winklevosses, by virtue of their office, stock ownership, and/or agreements or understanding, during the Class Period, had the power and authority to direct the management and

activities of Gemini and its employees and to cause Gemini to engage in the wrongful conduct detailed herein.

106.    The Winklevosses, separately or together, had the power to direct or cause the direction of the management and policies of Gemini and did so during the relevant time period with the Gemini Earn program.

107.    The Winklevosses jointly participated in, and/or aided and abetted, Gemini's sale and solicitation of securities, including GIAs through the Gemini Earn program, in violation of Sections 5 and 12(a)(1) of the Securities Act.

108.    The Winklevosses, separately or together, jointly participated in Gemini's failure to register GIAs and submit registration statements.

109.    As a result of the Winklevosses' conduct, they are liable to Plaintiff and the Class members for damages, disgorgement of ill-gotten gains, and/or recission, as well as costs, attorneys' fees, and interest.

## COUNT IV
### Control Person Liability: Violation of Section 20 of the Exchange Act
### (Against Tyler Winklevoss and Cameron Winklevoss)

110.    Plaintiff re-alleges, and adopt by reference herein, paragraphs 1 through 86 above as if fully stated herein.

111.    The Winklevosses, by virtue of their office, stock ownership, and/or agreements or understandings, during the Class Period, had the power and authority to direct the management and activities of Gemini and its employees and to cause Gemini to engage in the wrongful conduct detailed herein, and did so during the relevant time period with the Gemini Earn program.

112.    The Winklevosses, separately or together, had the power to direct or cause the direction of the management and policies of Gemini and did so during the relevant time period with the Gemini Earn program.

113.    The Winklevosses had sufficient control or influence to have caused Gemini to make the actionable misrepresentations and omissions discussed herein and in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

114.    The Winklevosses had sufficient control or influence to have caused Gemini to register as an exchange and broker-dealer and refrain from effecting the transactions of securities as an unregistered exchange and unregistered broker-dealer in violation of Sections 5 and 15 of the Exchange Act.

115.    As a result of the Winklevosses' conduct, they are liable to Plaintiff and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, respectfully prays for relief as follows:

(a) Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

(b) Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

(c) Declaring that Defendants' actions, as set forth above, violate the federal laws set forth above;

(d) Awarding Plaintiff and the Class actual, punitive, and exemplary damages as allowed by applicable law;

(e) Awarding equitable and injunctive relief, including without limitation recission, restitution, and disgorgement;

(f) Awarding statutory relief under federal law;

(g) Awarding reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

(h) Awarding pre-judgment and post-judgment interest; and

(i) Granting such other and further relief as this Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff and the putative class members hereby demand a trial by jury, pursuant to Fed. R. Civ. P. 38(b), on all issues so triable.

Dated: January 17, 2023.

Respectfully submitted,

*/s/ Jeff Ostrow*
Jeff Ostrow, Esq.
Florida Bar No.: 121452
Steven Sukert, Esq.
Florida Bar No.: 1022912
**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
ostrow@kolawyers.com
sukert@kolawyers.com

David C. Silver, Esq.
Florida Bar No.: 572764
**SILVER MILLER**
4450 NW 126th Avenue, Suite 101
Coral Springs, Florida 33065
Telephone: (954) 516-6000
dsilver@silvermillerlaw.com

*Counsel for Plaintiff and the Putative Class*